FLOYD F. FARLEY, Third-Party Plaintiff-Appellant, *v.* THE KISSELL COMPANY, Third-Party Defendant-Appellee.

(No. 58372;

First District (5th Division)—February 22, 1974.

Stephen B. Cohen and George C. Pontikes, both of Chicago (Foss, Schuman & Drake, of counsel), for appellant.

John Wood and Chester J. Maciorowski, both of Chicago (Sidley & Austin and Bamberger & Feibleman, of counsel), for appellee.

Mr. PRESIDING JUSTICE SULLIVAN delivered the opinion of the court:

This is an appeal by third party plaintiff from a judgment entered in favor of the third party defendant on an action brought for interference with contractual relations.

The original cause of action was brught by J. Raymond Kunz & Associates, Inc. (Kunz), against James Farley and Floyd Farley (Buyers) for commissions earned as the result of obtaining an interim construction loan from the Walter E. Heller Company (Heller). Buyers thereafter filed a third party action against The Kissell Company (Kissell), a mort-

gage banking corporation, for interference with contractual relations. With the exception of the third party suit the actions were settled. James Farley withdrew his third party claim against Kissell and Kunz adopted the third party pleadings of the Farleys against Kissell. The trial court found in favor of Kissell and only Floyd Farley has taken an appeal.

On November 12, 1964, the Merchants National Bank and Trust Company of Indianapolis (Merchants), acting as "Trustee" for James Farley and his father, Floyd Farley, entered into a 30-day option contract with Emmanuel and Alta Nell Farley (Sellers), to purchase property located in Marion County, Indiana, for development of an apartment complex (Pine Grove). Because of inter-family disputes Merchants was used as "Trustee" in order to hide Floyd's identity from that of his brother Emmanuel. Prior to this time, Sellers, who had obtained a permanent loan commitment from Massachusetts Mutual Life Insurance Company (Mass. Mutual) for $2,600,000, were going to develop the property themselves. However, they apparently had difficulty in obtaining the necessary interim financing and, as a result, the November 12 agreement was entered into with Merchants. The closing of the option contract was conditioned, among other things, upon merchantable title in the Sellers and an assignment from the Sellers to the Buyers of the end-loan commitment from Mass. Mutual. In addition, the Sellers were to obtain proper zoning and approval for water and sewer connections.

On December 8, 1964, a new agreement was executed between Merchants and Sellers modifying the original agreement and extending the option indefinitely. It stated, in part, that although up to the date of the modification the end-loan commitment had not been assigned, the parties were to continue to expend their efforts to effect the assignment and, if the parties were unsuccessful, the Sellers would then enter into an "association" with the Buyers for a one-quarter interest in the project in order to assure the Buyers of adequate long term financing.

On February 1, 1965, while attempts to obtain an assignment of the end loan apparently continued, James Farley, as agent for Floyd Farley, obtained an interim construction loan commitment through Kunz from Heller in the amount of $1,950,000. Ultimate funding of this commitment was subject, in pertinent part, to the following conditions:

    a. The end loan commitment from Mass. Mutual was to be in full force and effect and assigned to Heller;

    b. The borrowers were to present documents and certification that counsel for Heller would require; and

    c. Heller was to reserve the right to approve the contractors working on the project and that performance or payment bonds with approved surities would be furnished.

The Heller commitment was accepted by the borrowers on February 22, 1965, after payment by them of a $10,000 standby fee.

On March 1, 1965, a further modification of the previous agreements of November 12, 1964, and December 8, 1964, was agreed upon between the Sellers, James Farley as agent, and Merchants. The agreement acknowledged that the Buyers had obtained the aforementioned interim loan commitment and that James Farley was to continue to take the necessary steps for the funding of this commitment and assign the same to Sellers. However, if funding was not begun by March 12, 1965, Sellers would be free to proceed with the Pine Grove project alone.

While negotiations continued between the Sellers and Buyers, the Sellers undertook to obtain their own interim construction financing to develop the property themselves. The record indicates that Sellers, armed with the Mass. Mutual end loan commitment, approached Kissell sometime in the first quarter of 1965 and sought to secure interim financing. In the trial court, James Farley testified that he spoke with Kissell's employee, David Huncilman, in April, 1965, regarding the proposed loan commitment to Sellers and informed Huncilman that he and third party plaintiff, Floyd Farley, had an interest in the Pine Grove property which Kissell was interfering with. However, James Farley indicated that he never specifically discussed the nature of the arrangements regarding his contract with Sellers, but did show Huncilman the original option contract, the December 8 modification, and the Heller commitment letter.

Huncilman, although not a witness in the trial court, gave deposition testimony in suits filed in the Indiana State and Federal courts (discussed below) in which he stated that Emmanuel Farley approached him early in 1965 in regard to a construction loan and that he in turn informed his superiors. He further stated that James Farley contacted him *after* the Sellers had executed a loan agreement with Kissell and told him that he had an interest in the Pine Grove property. Huncilman also stated that he never saw the option contract or its modification. In the Indiana State court suit, Huncilman testified that as late as July 1965 he had no knowledge of the existence of any contracts between the Sellers and the Buyers, nor did he have any knowledge of pending negotiations between them. Huncilman did express his knowledge of the existence of a 60-day option contract on a parcel in the Pine Grove Development owned by "Mitchell", and in his testimony made reference to the Buyers' option with Sellers which he believed to have expired.

James Dossman, at the time of the transaction, was a branch manager for Kissell and, while not a witness in the trial court, gave deposition

testimony in the Indiana Federal court suit stating that he became aware of a dispute between Sellers and Buyers sometime in June 1965 and that James Farley came to Kissell's office on numerous occasions between June and December of 1965 claiming to have an interest in Pine Grove. Dossman felt, however, that the crux of James Farley's complaint revolved around the Mitchell property option. Dossman, moreover, did not see any documents concerning agreements between the Sellers, Buyers and Merchants. A memo in the Kissell files dated May 13, 1965, indicates that Kissell was aware of an option contract between Sellers and Buyers, but that Huncilman, the author of the memo, believed the option was to have lasted only 30 days and had expired by its own terms. Further, it was Dossman's belief that Floyd Farley had not been successful in obtaining interim construction financing or in obtaining the assignment of the end loan from Mass. Mutual.

The aforementioned 60-day option held on the Mitchell property was obtained by Floyd Farley and his wife on April 12, 1965, in an attempt by Floyd Farley to prevent the Sellers from having the clear title necessary to obtain the loan commitment from Kissell. The latter was aware of the option held by Floyd Farley and the closing of the loan with Sellers was delayed as a result. In June, Floyd Farley was informed by Mitchell that the option on the latter's property had expired and that an extension of time would not be given.

On July 23, 1965, an amended construction loan agreement for $1,950,000 between Sellers and Kissell was closed at the office of the Union Title Company, the original agreement having been executed on April 17, and the Sellers executed a note and mortgage to Kissell. Richard Turley of the Union Title Company stated in deposition testimony that the closing took place on July 23, after the expiration of the Mitchell option and that nothing was paid to Floyd and James Farley despite their claims for some consideration for the release of the Mitchell option. Turley further stated that he was unaware of the existence of any contract between the Sellers and Buyers prior to the closing and only learned of its existence after the closing.

On August 15, 1965, after learning of the Kissell loan, James Farley, as agent, filed a suit in the Superior Court of Marion County, Indiana, for specific performance against Sellers, Kissell and Merchants. This case was subsequently dismissed; however, after its initiation Kissell stopped further disbursements under the July 23 loan agreement.

On January 5, 1966, Kissell filed suit in the United States District Court for the Southern District of Indiana against Sellers, James Farley and two suppliers holding liens against Pine Grove. The complaint

sought, in pertinent part, judgment against Sellers on the mortgage note and a foreclosure of the mortgage. James Farley filed a counterclaim alleging substantially identical grounds for relief as those filed by Floyd Farley in the suit here. He also filed a cross-claim against Sellers seeking damages for breach of contract. James Farley's counterclaim was dismissed with prejudice because of a failure to proceed to trial. This dismissal was affirmed by the Court of Appeals for the Seventh Circuit. 417 F.2d 1180 (7th Cir.).

In the trial court here, Floyd Farley alleged that his breach of the Kunz contract, if in fact true, was attributable to Kissell's interference with his contractual rights with Sellers. Moreover, it was alleged that Kissell was aware of the contract between the Sellers and Buyers because Floyd Farley informed employees of Kissell of its existence and, as a result of their loan and the taking of a note and mortgage from Sellers, it became impossible for Floyd Farley to exercise his rights secured under the option and its modifying agreement.

The trial court in its memorandum of decision found that the Sellers had approached Kissell; that Emmanuel Farley wanted to continue the project on his own; that Emmanuel Farley did not intend to assign the Mass. Mutual commitment; and that Mass. Mutual was specifically instructed by Emmanuel Farley not to negotiate with the Buyers. The court, therefore, concluded that Kissell was not in the picture until after the Sellers became aware of Floyd Farley's involvement with the Buyers which, in part, occasioned Sellers refusal to turn the project over to the Buyers.

The court determined that Kissell did not have knowledge of the contracts prior to signing the April 17 loan agreement, but did have this knowledge prior to July 23.

In its conclusions of law the trial court found, *inter alia*, that Kissell's actions were not a proximate cause of the breach of contract between Sellers and Buyers; that the Seller's refusal to turn the project over was the proximate cause of the breach; that Kissell had no knowledge of the contracts prior to April 17, and that on July 23, Kissell had an equal right with plaintiff to deal with Sellers.

*OPINION*

■■ Floyd Farley alleges on appeal that the conduct of Kissell was a proximate cause of the breach of contract between Sellers and Buyers. Specifically, he argues that Sellers refused to close the aforementioned contract with Buyers because of the loan commitment obtained from Kissell. In order to establish a prima facie case of interference with contractual relations, the following elements must be established: (1) the

existence of a valid contract; (2) knowledge by Kissell of the existence of the contract; (3) inducement by Kissell to the other party to breach his contract; and (4) damages as a result of the inducement. *Marcus v. Wilson*, 16 Ill.App.3d 724, 306 N.E.2d 554.

Initially, we note the uniqueness of the instant situation inasmuch as the factual setting does not present the "traditional" interference with contract situation. That is to say, this is not a case of one competitor seeking to gain economic advantage at the expense of another competitor, nor does it appear that Kissell's actions were undertaken with the intention of harming the Buyers.

Second, in light of the findings of the trial court and those of the United States Court of Appeals in *Kissell Co. v. Farley*, 417 F.2d 1180 (7th Cir. 1969),[1] as well as our own examination of the record, we conclude that the agreement between the Sellers and Buyers of November 12 and its modification of December 8 were valid contracts. Moreover, we note that the March 1, 1965, modification agreement provided among other things that should the Heller commitment not be funded and assigned to them before March 12, 1965, the Sellers would proceed with the project as they saw fit. The Buyers seemingly suggest that the March 1 modification agreement had no effect on the existing contracts between the parties, allegedly because there was a mutual forbearance to abide by that agreement. As to whether this "forbearance" gave renewed vitality to the previous contracts will not be decided here, but suffice it to say that for purposes of this appeal, we will proceed as if the original contracts were valid and in effect at the time of the purported interference.

■■ The question raised by virtue of the above, and essential to the establishment of a prima facie case of interference with contract, is whether the trial court was correct in determining that at the time of the April 17 commitment, Kissell was unaware of the agreement between Sellers and Buyers. The trial court in his memorandum of decision found that there was no such knowledge and, in oral argument before this court, Floyd Farley conceded that Kissell lacked knowledge of any contract prior to April 17. Therefore, it would unduly lengthen this opinion to recite the reasons for the trial court's decision as to this pivotal point and, in the absence of any evidence to contradict this finding, we are constrained to follow the determination rendered below. The controlling

---

[1] 417 F.2d at 1184:
"[T]he agreement between Merchants National Bank and Emmanuel and Alta Nell dated November 12, 1964 is a contract to sell the Pine Grove Real Estate and not merely an option to purchase."

principle is stated in Harper, *Interference with Contractual Relations,* 47 Nw.U.L.Rev. 873, 880, 881 (1953) as follows:

> "Since the test of inducing breach of contract requires an intention on the part of the actor to interfere with another's contractual relations, it is clear that he must know of the existence of the contract with which he interferes or in any event, of facts from which such contract is reasonably to be inferred. A person cannot be held liable for inducing a breach of contract which he neither knew nor had reason to know existed."

Accordingly, without having knowledge of the existing contracts, we believe Kissell could not be liable for the tort of interference with contract.

On the question of inducement or proximate cause, assuming some knowledge on Kissell's part, a review of the record indicates that prior to obtaining Kissell's loan commitment, Sellers displayed a predisposition to avoid the effects of their contract with the Buyers. In the trial below, James Farley's testimony indicated that the Sellers were not anxious to close with the Buyers.[2] Moreover, at trial, James Farley acknowledged that after learning of Floyd's participation, Emmanuel changed his mind about selling the property.[3]

In addition, statements made in the complaint in the Indiana State court suit for specific performance brought by James Farley[4] and in

---

[2] Report of Proceedings

"A. One was the reluctance of Emmauel to let us talk to Mass. Mutual to negotiate the changing of the commitment, reluctance of various other things.

\* \* \*

Making the land readily available, since there were other parties involved, they all had to be brought together in agreement to sign.

\* \* \*

Also he (Seller) was out shopping the deal around to other companies trying to find somebody to make another interim loan."

[3] Report of Proceedings

"After Emmanuel Farley found out in early February \* \* \* who the principals were, he immediately wanted to stay in the picture and take over our financing that we had set up and caused us not to be able to negotiate personally with Massachusetts Mutual, which was a key part of the contract, to switch the commitment from Emmanual Farley to our group.

[4] 4. That from time to time since the execution of said agreement defendants Farleys have repeatedly advised plaintiff (James Farley) and plaintiff predecessor in interest, defendant Merchants, that they would *not perform said agreement,* and specifically that they would not convey the above described real estate to defendant Merchants.

James Farley's counterclaim in Kissell's Federal court suit,[5] indicate that Sellers refused to perform prior to obtaining Kissell's loan commitment. We note also that the testimony of James Farley adduced in the trial court and the exhibits offered therein, indicate that the Buyers could not meet the conditions of the Heller loan commitment for funding insofar as they had not provided construction bids nor had they obtained an assignment of the Mass. Mutual end loan for themselves and ultimately for Heller. Consequently, without the necessary funding, the Buyers were apparently unable to provide the purchase price for the Seller's land and, therefore, in no position to close the contract. These facts when coupled with the Sellers' desire to complete the project alone, belies any "inducement" by Kissell for Sellers to breach their contract with the Buyers. As stated in Prosser, Handbook on the Law of Torts (4th ed. 1971), sec. 129:

> "In order to be held liable for interference with a contract, the defendant must be shown to have caused the interference. It is not enough that he merely has reaped the advantages of the broken contract after the contracting party has withdrawn from it of his own motion."

The Restatement (4 Restatement of Torts, sec. 766 (1939)) takes the position in Comment d that:

> "The essential thing is the purpose to cause the result. If the actor does not have this purpose, his conduct does not subject him to liability under this rule even if it has the unintended effect of deterring the third person from dealing with the other."

■■ We conclude that the facts as presented herein do not support the proposition that Kissell sought to "induce" a breach between the Sellers and Buyers. *See also, Augustine v. Trucco,* 124 Ca.2d 229, 268 P.2d 780, 791 (1954), cited by the court below in his memorandum of decision, where it was stated:

> "A plaintiff, seeking to hold one liable for unjustifiably inducing another to breach a contract, must allege that the contract would otherwise have been performed, and that it was breached and

---

[5] 4. Upon securing the financing as described hereinabove (Heller), the Counter-plaintiff made repeated requests to E & A Farley to transfer the mortgage commitment heretofore described from themselves to the Counterplaintiff, so that Counterplaintiff might exercise the option and avail himself of the financing arrangement described hereinabove. Despite such requests, E & A Farley refused to abide by the Modification Agreement and refused to transfer the mortgage commitment to the Counterplaintiff so that Counterplaintiff was unable to exercise the option described hereinabove and was unable to avail himself of the financing obtained in reliance upon said Modification Agreement."

abandoned by reason of the defendant's wrongful act and that such act was the moving cause thereof. Unless the act complained of was the proximate cause of the injury, there is no liability."

■■ Plaintiff's contentions suggest that while there may have been no overt inducement on Kissell's part, the loan commitment from Kissell was damaging to Buyers and this, in itself, they claim was sufficient to impose liability on Kissell. In the absence of any such knowledge of an existing contract on Kissell's part, we find the position untenable. Harper, *Interference with Contractual Relations*, 47 Nw.U.L.Rev. 873, 880-882 (1953); *Wade v. Culp*, 107 Ind. App. 503, 23 N.E.2d 615 (Ind. 1939).

■■ Finally, here, where Kissell is a lender, not a competing purchaser, the reasoning found in Sayre, *Inducing Breach of Contract*, 36 Harv. L. Rev. 663, 679, 680 (1923), is appropriate:

"And by way of further analysis, one may be said to have a mind bent on appropriating for himself the promised advantages belonging to another when his object in inducing the breach of contract is the same as was that of the plaintiff in the making of the contract. If his mind is bent upon some entirely different object, even though his action incidentally causes the breach, it can hardly be called a 'wrongful taking' of another's property. In other words, where the defendant's object in causing the breach is foreign to the object entertained by the plaintiff in the making of the contract, it is a case of incidentally *causing* rather than *procuring* or *inducing* a breach of contract, and falls outside of the proper limits of the tort."

Therefore, in light of the plaintiff's failure to establish the requisite elements necessary to impose liability upon Kissell, and because we feel the trial court's decision as to the absence of Kissell's knowledge and lack of proof necessary to establish causation was correct, we will not review the remaining issues presented for review.

For the reasons stated, the judgment of the trial court is affirmed.

Judgment affirmed.

DRUCKER and LORENZ, JJ., concur.